**The DOW CHEMICAL CORPORATION, Plaintiff-Appellee,**

v.

**WEEVIL–CIDE COMPANY, INC.; Research Products Company; Hartford Accident & Indemnity Company, Defendants–Appellants.**

**No. 88–2045.**

United States Court of Appeals, Tenth Circuit.

Feb. 28, 1990.

Rehearing Denied March 26, 1990.

William H. Sanders, Sr., Blackwell Sanders Matheny Weary & Lombardi, Kansas City, Mo. (James D. Griffin, Blackwell Sanders Matheny Weary & Lombardi, Kansas City, Mo., Keith Martin and Bruce Keplinger, Payne & Jones, Overland Park, Kan., with him on the briefs), for defendants-appellants.

Kevin T. Van Wart, Kirkland & Ellis, Chicago, Ill. (David M. Bernick, Michael R. Powers, Kirkland & Ellis, Chicago, Ill.,

Roger Stanton and Steven Leben, Stinson, Mag & Fizzell, Overland Park, Kan., with him on the briefs), for plaintiff-appellee.

Before MOORE, McWILLIAMS, and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Plaintiff-appellee Dow Chemical Corporation ("Dow") prevailed in the United States District Court for the District of Kansas on its claim against defendant-appellants Weevil-Cide Company and Research Products Company (collectively "Research Products"[1]) for equitable subrogation, and on its claim against defendant-appellant Hartford Accident and Indemnity Company ("Hartford") for tortious interference with a prospective contractual relation. We reverse both judgments.

## BACKGROUND

For many years, Research Products marketed a grain fumigant containing carbon tetrachloride and carbon disulfide known as Weevil-Cide, which was manufactured for it by Dow. R.Vol. III at 132; R.Vol. V at 424–25. Dow also produced and distributed its own brands of carbon tetrachloride-carbon disulfide fumigant. R.Vol. III at 96.

Robert Kauther and Ardell Nordrum were exposed to carbon tetrachloride-carbon disulfide fumigants when they worked at a Wisconsin grain elevator. R.Vol. V at 536–37; R.Vol. VI at 720. Both came to suffer severe neurological disorders which forced them to retire. R.Vol. IV at 287–88. In October 1978, Kauther and Nordrum each filed suit against Dow and Research Products alleging inadequate warnings about the effects of exposure to Weevil-Cide.

Research Products' insurer, Hartford, assumed its defense and retained Harry Sauthoff, with whom Hartford had a long-standing relationship. R.Vol. IV at 272–77. Soon after discovery began, Sauthoff advised Hartford that the plaintiffs had a

strong case, and that the best course would be for Research Products and Dow to contribute equally to a settlement. *See* Addendum to Brief of Appellee at Tab 8, p. 5. As discovery progressed, Sauthoff emphatically advised Hartford to settle rather than go to trial. *See id.* at Tab 9, p. 5, at Tab 12, p. 6.

When the settlement negotiations began, however, Hartford directed Sauthoff not to participate, purportedly because of uncertainty as to whether or not Hartford had a policy in effect when Kauther and Nordrum were harmed. Dow contends that this coverage question was a sham designed to make Dow pay the entire settlement. In any event, Dow settled with Kauther and Nordrum in April 1984 for more than four million dollars, R.Vol. IV at 347; R.Vol. V at 450–51, which Kauther and Nordrum's attorney considered sufficient to cover the claims against both Dow and Research Products, R.Vol. V at 504, 507. While the settlement was "with Dow Chemical Company, but not with the Research Products or Weevil-Cide defendants," Addendum to Brief of Appellee at Tab 25, p. 2, the suits were dismissed as to both Dow and Research Products. Stipulation and Order for Dismissal, May 2, 1984, Addendum to Brief of Appellee at Tab 17, p. 4.

In April 1985, Dow sued Research Products for equitable subrogation of the amount paid to the grain workers. The complaint was amended to allege that Hartford tortiously interfered with Dow's prospective economic advantage when it instructed Sauthoff not to settle. The jury awarded Dow $2.334 million on its subrogation claim, and seven hundred seventy-eight thousand dollars in actual damages and $2.25 million in punitive damages on the tortious interference claim.

## DISCUSSION

### I. EQUITABLE SUBROGATION

#### A. *Statute of Limitations*

■ A federal court hearing a diversity action applies the statute of limitations

---

**1.** Research Products Company acquired Weevil-Cide Company in 1967. Addendum to Brief of Appellants at Tab 1. Because some of the events underlying this litigation occurred before 1967, they involved Weevil-Cide Company rather than Research Products. This distinction is not important to either party's liability, though, so it will be disregarded herein.

which would be applied by a court of the forum state, *Kitchens v. Bryan County Nat'l Bank*, 825 F.2d 248, 254–55 (10th Cir.1987), even when the action is brought under the law of a different state. *Warner v. Auberge Gray Rocks Inn*, 827 F.2d 938, 939–40 (3d Cir.1987); *Crosson v. Conlee*, 745 F.2d 896, 902 (4th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985). Kansas courts apply the limitations period of the state where the claim arose, so this action is controlled by the Wisconsin statute of limitations, as interpreted by the courts of Wisconsin. Kan.Stat.Ann. § 60–516 (1983); *see Green v. Kensinger*, 199 Kan. 220, 429 P.2d 95, 98–99 (1967).

■ The trial court analogized subrogation to contribution and equitable indemnification, and held that Dow's complaint was timely because the claim did not accrue until the payment was made. Memorandum and Order, Dec. 1, 1987, R.Vol. I at Tab 122, pp. 7–8; Memorandum and Order, June 2, 1988, R.Vol. II at Tab 184, pp. 8–9. Unlike these causes of action, however, the claim of a subrogation plaintiff, or subrogee, "is not a separate cause of action from the right held by the subrogor," *Wilmot v. Racine County*, 136 Wis.2d 57, 400 N.W.2d 917, 919 (1987), but is derivative of the underlying claim which the subrogor held against the subrogation defendant. "[A] subrogee is one who steps into the shoes of the subrogor to the extent it has made payment as a result of the actionable event." *Id.* "The extent of the new right created in favor of the subrogee is measured by the original right in the subrogor." *Waukesha County v. Johnson*, 107 Wis.2d 155, 320 N.W.2d 1, 3 (Ct.App.1982).

■ Because the subrogee's rights against the subrogation defendant are only as great as the subrogor's rights against that defendant, an equitable subrogation claim must be brought within the time the subrogor would have been required to bring its claim. In effect, then, the subrogation cause of action arises at the same time, and is governed by the same statute of limitations, as the underlying claim. *See, e.g., Fidelity & Deposit Co. v. Smith*, 730 F.2d 1026, 1034 (5th Cir.1984); *United States v. Bureau of Rev.*, 217 F.Supp. 849, 852–53 (D.N.M.1963); *Bickerstaff v. Ellis*, 204 Ga. 734, 51 S.E.2d 821, 824 (1949); *Federal Kemper Ins. Co. v. Isaacson*, 145 Mich.App. 179, 377 N.W.2d 379, 381 (1985); *Sheppard v. State Farm Mut. Auto. Ins. Co.*, 496 S.W.2d 216, 218 (Tex.Civ.App. 1973). *But see Pennwalt Corp. v. Metropolitan Sanitary Dist.*, 368 F.Supp. 972, 980 (N.D.Ill.1973). Subrogation must be distinguished in this respect from contribution and equitable indemnification. *Commercial Union Assur. Co. v. City of San Jose*, 127 Cal.App.3d 730, 179 Cal.Rptr. 814, 817 (1982); *Aetna Cas. & Sur. Co. v. Windsor*, 353 A.2d 684, 686 (D.C.Ct.App. 1976); *Fishel's Fine Furniture v. Rice Food Market*, 474 S.W.2d 539, 541 (Tex. Civ.App.1971). Therefore, the trial court misapplied the statute of limitations.

■ Research Products, which was entitled to assert "such defenses as were available against the subrogors," *Employers Ins. Co. v. Sheedy*, 42 Wis.2d 161, 166 N.W.2d 220, 222 (1969); *accord American Standard Ins. Co. v. Cleveland*, 124 Wis.2d 258, 369 N.W.2d 168, 171 (Ct.App. 1985), also argued at trial that Kauther and Nordrum's claims were not timely filed, but the trial court refused to instruct the jury on the issue. This decision had the effect of withdrawing the question from the jury, so the standard of review is the same as that used to review a directed verdict or a judgment notwithstanding the verdict: " ' "whether there [was] evidence upon which the jury could properly [have found] a verdict for [Research Products]." ' " *Mackey v. Burke*, 751 F.2d 322, 325 (10th Cir.1984) (quoting *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir.1984) (quoting 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524, at 543 (1971))).

Under Wisconsin law, a tort claim arises when "the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by defendant's conduct or product." *Borello v. United States Oil Co.*, 130

Wis.2d 397, 388 N.W.2d 140, 146 (1986). Kauther and Nordrum's claims, which were governed by a three-year limitations period, Wis.Stat.Ann. § 893.54 (West 1983), were filed in October 1978, so the question is whether or not the jury could have found that the grain workers knew or should have known of a cause-and-effect relationship between Weevil–Cide and their neurological problems before October 1975.

Ardell Nordrum testified to the following conversation he had with his family physician no later than 1972:

> "A.... I did realize [Weevil–Cide] was dangerous because ... when my hands sleep feeling [sic] ... I took the contents on the side of that pail up to him, and ... I showed him that card and I said what does that stuff do to a person's body. And he turned around to a little desk there about four inches wide, ten inches long and puttered a little bit and he turned around, where did you use that stuff. I said we put it in the grain to kill weevils. And he says well, don't ever breathe it."

R.Vol. VI at 712–13.

In addition, two of Research Products' medical experts testified that carbon disulfide poisoning would have been diagnosable by a reasonably competent physician before October 1975. R.Vol. VI at 667–68; R.Vol. VII at 844–45.

Dow presented evidence that the condition was not discoverable before October 1975. For example, the twelve local doctors who examined the grain workers could not diagnose their illness. R.Vol. V at 470. The first doctor to identify carbon disulfide as the cause was a specialist from the University of Wisconsin who examined Kauther and Nordrum in 1978. R.Vol. IV at 352.

The trial court did not see "any evidence to support" Research Products' proposed instruction on the issue. R.Vol. VII at 1017. We disagree. The jury reasonably could have concluded that carbon disulfide

poisoning was (depending upon the weight given Nordrum's testimony) or should have been (if Research Products' experts were believed) identified as the cause of Kauther and Nordrum's ailments before October 1975.

On remand, both the timeliness of Kauther and Nordrum's actions and the timeliness of Dow's action will be at issue. The two questions are related, but not necessarily identical. If Kauther and Nordrum's claims were time barred, then Dow's claim also was time barred, because Dow stands in the position of the grain workers and the running of the statute of limitations would permanently extinguish the claims against Research Products. *See In re Estate of Fessler,* 100 Wis.2d 437, 302 N.W.2d 414, 420 (1981); *Schafer v. Wegner,* 78 Wis.2d 127, 254 N.W.2d 193, 197 (1977). The converse of this—that if Kauther and Nordrum's claims were timely, then Dow's claim was timely—is not necessarily true. Even if the statute did not run while the underlying litigation was pending, it is possible that the limitations period expired sometime between the dismissal of the grain workers' suits and the institution of this action, unless some additional tolling measure operated.[2]

## B. Release or Assignment

■ When it settled the underlying action, Dow did not obtain any release or assignment of the grain workers' claims against Research Products. For this reason, Research Products contends that Dow merely settled the claims against itself, and did not acquire any subrogation rights.

Equitable subrogation " 'depend[s] upon no contract or privity.' "[3] *Kennedy–Ingalls Corp. v. Meissner,* 5 Wis.2d 100, 92 N.W.2d 247, 250 (1958) (quoting *Stroh v. O'Hearn,* 176 Mich. 164, 142 N.W. 865, 869 (1913)). The right to equitable subrogation arises from the payment of another's debt, whether or not the claim has been assigned or released. "[T]here is 'no distinction in

2. We express no opinion on these questions.

3. It may be contrasted with conventional subrogation, which "arise[s] by contract of the par-

ties." *Cunningham v. Metropolitan Life Ins. Co.,* 121 Wis.2d 437, 360 N.W.2d 33, 37 (1985).

principle between the case of where a third party discharges the liability of another by payment and one where such liability is discharged through a release of a valid claim.'" *D'Angelo v. Cornell Paperboard Prods. Co.*, 19 Wis.2d 390, 120 N.W.2d 70, 76 (1963) (quoting *Kennedy–Ingalls Corp. v. Meissner*, 92 N.W.2d at 250). The trial court correctly determined that a claim for equitable subrogation does not require an assignment or release of the underlying obligation. *See Perkins v. Utnehmer*, 122 Wis.2d 497, 361 N.W.2d 739, 740–41 (Ct. App.1984).

## C. Lack of Fault

■ Research Products argues that the judgment against it must be reversed because a subrogation plaintiff must show that it was free from fault for the underlying claim, and that Dow failed to do so. This issue was not preserved for appeal, however, because Research Products did not raise it until its motion for judgment notwithstanding the verdict. Only questions raised in a prior motion for directed verdict may be pursued in a motion for judgment notwithstanding the verdict. *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1455 n. 2 (10th Cir.1987).

Research Products argues that it could not have raised the issue in its directed verdict motion because Dow at that time sought both subrogation and contribution.

The contention is that, because Dow would not have had to show a lack of fault in order to collect on its contribution claim, the issue did not exist until the contribution claim was dropped. We reject this argument. While the issue was not as important until Dow dropped the contribution claim, nothing ever prevented Research Products from seeking a directed verdict on the subrogation claim on this ground. *See Eli Lilly & Co. v. Home Ins. Co.*, 794 F.2d 710, 717 (D.C.Cir.1986).

Because the issue was not properly raised below, this court shall not consider it. *Farmers Ins. Co. v. Hubbard*, 869 F.2d 565, 570 (10th Cir.1989); *Stephens Indus., Inc. v. Haskins & Sells*, 438 F.2d 357, 361 (10th Cir.1971).[4]

## D. Evidentiary Rulings

■ Research Products challenges the decisions of the trial court to exclude certain evidence and to admit other evidence without a limiting instruction. Only for an abuse of discretion will we disturb a trial court's determination that proffered evidence was or was not relevant, or that its probative value did or did not outweigh its prejudicial effect. *Durflinger v. Artiles*, 727 F.2d 888, 890 (10th Cir.1984); *Beacham v. Lee–Norse*, 714 F.2d 1010, 1014 (10th Cir.1983).

**4.** As this case is being remanded for other reasons, the question of whether or not Research Products may raise this issue upon remand will arise. In *Ramey Constr. Co. v. Apache Tribe*, 673 F.2d 315, 318 (10th Cir.1982), this court allowed a party to raise upon remand an issue it had not raised on the prior appeal, but only because the issue was jurisdictional (and therefore non-waivable). *Accord Commodities Export Co. v. United States Customs Serv.*, 888 F.2d 431, 438 (6th Cir.1989). It follows that non-jurisdictional issues waived earlier in the proceedings may not be asserted upon remand. *See, e.g., Washington Post Co. v. United States Dep't of HHS*, 865 F.2d 320, 327 & n. 9 (D.C.Cir.1989); *National Farmers Org. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1311 (8th Cir.1988); *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 618 (5th Cir.1988); *Bratt v. IBM*, 785 F.2d 352, 364 (1st Cir.1986); *Ralston Oil & Gas Co. v. Gensco, Inc.*, 706 F.2d 685, 692 (5th Cir.1983); *Kilbarr Corp. v. Business Sys. Inc., B.V.*, 679 F.Supp. 422, 427–28 (D.N.J.1988), *aff'd*

*without opinion*, 869 F.2d 589 (3d Cir.1989); *Millhollin v. Ford Motor Credit Co.*, 531 F.Supp. 379, 382–83 (D.Or.1981). *But see United States v. Sanchez–Lopez*, 879 F.2d 541, 556 (9th Cir. 1989); *Riley v. MEBA Pension Trust*, 452 F.Supp. 117, 120 (S.D.N.Y.), *aff'd*, 586 F.2d 968 (2d Cir. 1978). A question not timely raised at a first trial may not be raised at a second trial of the same action. The fortuity that other grounds for reversal and remand exist should not revive an otherwise extinct issue.

A related question is whether or not, upon remand, Dow should be permitted to reinstate its claims against Research Products for contribution and indemnification. Dow's original complaint sought subrogation, contribution, and indemnification, but (apparently as a result of the trial court's legal conclusions regarding subrogation) the latter two claims were dropped. Unlike the subrogation claim, these claims are not before us. Therefore, we express no opinion on their availability upon remand.

The first issue is the exclusion of evidence offered to show that Kauther and Nordrum were exposed not only to Weevil–Cide, but also to carbon tetrachloride–carbon disulfide fumigants marketed by Dow. The court denied the proffer on the grounds that Research Products had made no effort to establish a causal connection between Dow fumigants and Kauther and Nordrum's conditions, but instead had argued that Kauther and Nordrum were not suffering from carbon disulfide poisoning at all. Memorandum and Order, June 2, 1988, R.Vol. II at Tab 184, p. 18. The fact of the matter, however, is that the proffered evidence was Research Products' effort to establish such a causal connection. Even though the contentions were contradictory, Research Products should have been allowed to argue both that the grain workers did not have carbon disulfide poisoning and that if they did have it, Dow products were to blame. *See Brownlow v. Aman,* 740 F.2d 1476, 1490–91 (10th Cir. 1984); *Little v. Texaco, Inc.,* 456 F.2d 219, 220 (10th Cir.1972).

The jury had to decide how much of the settlement should have been paid by Research Products.[5] Without complete evidence of *both* parties' possible responsibility for the harm to the grain workers, however, determining Research Products' fair share of the settlement would be difficult, if not impossible. The amount by which Research Products was unjustly enriched was a function of the amount of damage it caused, and the amount of damage Research Products caused could not be determined effectively without reference to how much, if any, of the damage was caused by Dow instead.[6] Exclusion of this evidence was an abuse of discretion.

The trial court also excluded two internal Dow memoranda. One of the documents discusses carbon tetrachloride-carbon disulfide fumigants, but the subject of the report is the risk posed by carbon tetrachloride. Carbon disulfide is mentioned only in passing. *See* Addendum to Brief of Appellants at Tab 24. We agree with the trial court's determination that this memorandum was irrelevant because it concerns a chemical other than the one at issue. *See, e.g., Hale v. Firestone Tire & Rubber Co.,* 820 F.2d 928, 935–36 (8th Cir.1987). The same document was excluded for the same reason from the trial of a suit against Dow and Research Products brought by another grain worker complaining of carbon disulfide poisoning. *Nigh v. Dow Chemical Co.,* 634 F.Supp. 1513, 1518–19 (W.D.Wis.1986).

The other document is a 1982 report on the question of whether or not Dow should withdraw from the liquid grain fumigant market. The trial court gave two reasons for excluding this memorandum: that it relates to subsequent remedial measures, Memorandum and Order, June 2, 1988, R.Vol. II at Tab 184, p. 19, and that it was more prejudicial than probative, R.Vol. V at 456.

The memorandum should not have been excluded as evidence of subsequent remedial measures. *See* Fed.R.Evid. 407. There is nothing remedial about the report's recommendation that Dow remain in the grain fumigant business without conducting any further medical research. "Remedial measures are those actions taken to remedy any flaws or failures." *Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron,* 805 F.2d 907, 918 (10th Cir.1986). Acts which do nothing to make the harm less likely to occur should not be excluded under Rule 407. 23 C. Wright & K. Graham, *Federal Practice*

---

5. The jury was instructed, in part, as follows: "[Y]ou should find, as damages against Weevil–Cide/Research, what amount of the settlement paid by Dow that, in equity and good conscience, should have been paid by Weevil–Cide/Research.

In your deliberations on Dow's subrogation claim, you may consider, among other things, ... the degree of fault of all persons or entities involved in the occurrence."

Instructions to the Jury, R.Vol. II at Tab 169, p. 10.

6. This evidence was relevant even if Dow did not have to prove a lack of fault. Even if a showing of Dow's blameworthiness would not have resulted in a judgment against Dow, it would have allowed the jury to reduce the amount of its verdict against Research Products.

*and Procedure* § 5284, at 106–07 (1980 & Supp.1989); *see, e.g., Patrick v. South Cent. Bell Tel. Co.*, 641 F.2d 1192, 1195–96 (6th Cir.1980).

■ Nor should the document have been excluded for insufficient relevancy. Research Products sought to introduce it only as evidence that the settlement Dow reached was unreasonably high. Some of the language in the report (e.g., "we should continue to milk the grain fumigants business," Addendum to Brief of Appellants at Tab 25, p. 2) might have tarnished Dow before the jury, but that would not have been "unfair," Fed.R.Evid. 403. Research Products' argument is that Dow's fear of the effect on a jury of this report, were it used in the Kauther and Nordrum litigation, was one reason why Dow was so anxious to avoid a trial that it paid an exorbitant settlement. The reasonableness of the settlement is relevant to the question of how much of it should have been paid by Research Products.

This document was excluded from the *Nigh* trial, but only because it did not relate to Dow's fault. The court in that case noted that the report might well have been relevant in determining how much Dow would have had to pay in punitive damages, had it been found liable. *Nigh v. Dow Chemical Co.*, 634 F.Supp. at 1519. The trial court abused its discretion by excluding this memorandum.

■ An important part of Dow's evidence in this case consisted of litigation reports sent to Hartford by Harry Sauthoff, the attorney Hartford retained to represent Research Products in the Kauther and Nordrum litigation. These letters contained Sauthoff's opinions regarding Research Products' liability and chances for success if the claims went to trial. Research Products requested that admissibility of the Sauthoff letters be limited to the tortious interference claim only, but the

trial court admitted them as to both the tortious interference claim and the subrogation claim. The trial court considered the letters relevant to the subrogation claim because they were evidence of "both the state of Weevil–Cide's defense at the time of settlement, which was shortly before trial, and the issue of whether Weevil–Cide was actually negligent." Memorandum Opinion and Order, June 2, 1988, R.Vol. II at Tab 184, p. 20. The court also rejected the argument that even if the letters were relevant, their probative value was outweighed by their prejudicial effect. R.Vol. VII at 1014–15.

Clearly, the letters were logically relevant. They were perhaps the best evidence of how much Research Products could have expected to lose if the Kauther and Nordrum actions went to trial, which is evidence of the extent to which Research Products was unjustly enriched when Dow settled those actions. Nor can it be said that the trial court abused its discretion because the letters' probative value was substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. "The exclusion of relevant evidence under Rule 403 is 'an extraordinary remedy to be used sparingly.'" *K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 (10th Cir.1985) (quoting *United States v. Plotke*, 725 F.2d 1303, 1308 (11th Cir.), *cert. denied*, 469 U.S. 843, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984)). Research Products has not shown how any information contained in the letters could have hindered the jury's search for truth. *See* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[01], at 403–13 to –16 (1989).

## II. INTERFERENCE WITH A PROSPECTIVE CONTRACTUAL RELATION

■ An obvious element of the tort of intentional interference with a prospective contractual relation[7] is a relation with

---

7. The tort in question has been called business interference, intentional interference with a prospective contractual relation, intentional interference with business advantage, and intentional interference with a prospective economic advantage. While the different labels all describe the exact same tort, *PPX Enterp., Inc. v. Audiofidelity Enterp., Inc.*, 818 F.2d 266, 269 (2d Cir.1987); 3 J. Dooley, *Modern Tort Law* § 44.01, at 415, § 44.02, at 418 (rev. ed. 1984), we shall use "intentional interference with a prospective contractual relation" because that is

which the defendant has interfered. It is well-established that the relation must be one to which the defendant is an outsider, *see, e.g., Ellis v. City of Valdez,* 686 P.2d 700, 708 (Alaska 1984); *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895, 897 (1971); *Gonzalez v. Gutierrez,* 694 S.W.2d 384, 388 (Tex.Ct.App.1985); *Board of Trustees v. Holso,* 584 P.2d 1009, 1017 (Wyo.1978); *see also Restatement (Second) of Torts* § 766B (1979); Annotation, *Liability of Third Party for Interference with Prospective Contractual Relationship Between Two Other Parties,* 6 A.L.R.4th 195, 201–03 (1981), for one cannot "interfere" [8] with its own affairs.

 Dow neither pleaded nor proved the existence of any prospective relation between Dow and anyone other than Hartford. The testimony of the president of Research Products that his company would not have contributed to the settlement, R.Vol. VII at 989, went uncontradicted. Clearly, Dow expected any contribution to come directly from Hartford.[9] In fact, Dow's complaint in this action does not allege any interference by Hartford between Dow and Research Products; instead, it charges Hartford with disrupting "the arrangement previously reached by Dow and *The Hartford's* representatives." R.Vol. I at Tab 85, p. 14 (emphasis added).

Generally, an insured defendant and its insurer have a common, interrelated interest in defending and/or settling the suit. 1A R. Long, *The Law of Liability Insurance* § 5A.01, at 5A–8 (1989); A. Windt, *Insurance Claims and Disputes* § 4.18, at 171 (2d ed. 1988); *cf. Gonzalez v. City of Franklin,* 137 Wis.2d 109, 403 N.W.2d 747, 754 (1987); *Hilker v. Western Auto. Ins. Co.,* 204 Wis. 1, 231 N.W. 257, 259 (1930), *aff'd on reh'g,* 204 Wis. 1, 235 N.W. 413 (1931). In Wisconsin, a tortfeasor's insurer is liable to the victim, and may be sued directly. Wis.Stat.Ann. §§ 632.24, 803.-

04(2) (West 1980). This direct liability " 'place[s] the burden upon the insurance carrier, who has been compensated in advance for its liability, to pay the damage assessed for such injuries to person and damage to property as have been caused by' " the insured. *FDIC v. MGIC Indem. Corp.,* 462 F.Supp. 759, 761 (E.D.Wis.1978) (quoting *Ducommun v. Strong,* 193 Wis. 179, 212 N.W. 289, 292 (1927)); *see also Loy v. Bunderson,* 107 Wis.2d 400, 320 N.W.2d 175, 187 (1982). Thus, when a tortfeasor and its insurer are sued in Wisconsin, "the insurer is the real party in interest." *Sayre v. Townsend,* 106 F.R.D. 544, 545 (E.D.Wis.1985); *see also Padden v. Gallaher,* 513 F.Supp. 770, 772 (E.D.Wis. 1981); 3 G. Couch, *Cyclopedia of Insurance Law* § 45:930, at 586 (rev. 2d ed. 1984).

As it happens, Hartford was not a named defendant in the Kauther and Nordrum actions against Dow and Research Products. This is not important to the present case, though, because nothing would have occurred any differently had Hartford been named: Hartford "conduct[ed] the defense, employ[ed] its own attorney[ ], decide[d] if and when to settle, and [was] in full control of the entire litigation." *Kirchen v. Orth,* 390 F.Supp. 313, 318 (E.D.Wis.1975). Also, the fact that Hartford was not named did not affect Hartford's direct liability to the grain workers if Research Products was culpable. Wis.Stat.Ann. § 632.24 (West 1980); *see Loy v. Bunderson,* 320 N.W.2d at 189; *Kranzush v. Badger State Mut. Cas. Co.,* 103 Wis.2d 56, 307 N.W.2d 256, 266 (1981); A. Windt, *supra,* at 463.

Hartford, not Research Products, was Dow's only prospective source of contribution to the settlement. Hartford cannot be held liable for interfering with its own prospective contractual relation, so the judgment against it must be reversed.

---

the appellation chosen by *Restatement (Second) of Torts* § 766B (1979), and adopted in Wisconsin. *See Cudd v. Crownhart,* 122 Wis.2d 656, 364 N.W.2d 158, 160 (Ct.App.1985).

**8.** To interfere is "to enter into or take part in the concerns *of others." Webster's Third New Inter-*

*national Dictionary* 1178 (1981) (emphasis added).

**9.** Dow's counsel admitted as much at trial. R.Vol. VII at 1009.

## CONCLUSION

The verdict against Research Products cannot stand because of the misapplication of the statute of limitations, the failure of the trial court to instruct the jury on the timeliness *vel non* of Kauther and Nordrum's claims, and the exclusion of certain evidence. The decision against Hartford is deficient because Hartford did not interfere with any prospective contractual relation.

The judgment against Research Products is REVERSED and REMANDED for further proceedings consistent with this opinion. The judgment against Hartford is REVERSED.